Filed 4/8/14  In re A.L. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.L., a Person Coming Under the Juvenile Court Law. | B248645 |
| | (Los Angeles County Super. Ct. No. CK93603) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ABEL N., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Philip L. Soto, Judge.  Affirmed.

Andre F. F. Toscano, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

## BACKGROUND

In this dependency matter, appellant Abel N. (Father) contends the juvenile court erred in failing to place his four-year-old daughter, A.L., with him in Idaho. We disagree. Substantial evidence supports the court's finding that placement with Father in Idaho would have been detrimental to A.L.'s emotional well-being. The evidence that supports the finding includes the following: (1) A.L.'s mother, Isabel L., (Mother) resides in Los Angeles and has a parental bond with A.L.; (2) prior to placement, Mother had been A.L.'s primary caregiver for A.L.'s entire life; (3) A.L. "had a hard time" being separated from Mother when she was placed in foster care and her need for certain therapies was attributed to that separation; (4) moving A.L. to Idaho would likely prevent Mother from visiting and might hamper Mother's reunification with A.L.; (5) if reunification efforts with Mother should fail, placement with Father can be reconsidered; (6) at the time of the dispositional hearing, it was uncertain whether therapies the juvenile court deemed to be important for A.L. were available to her in Idaho; and (7) A.L. and her half-brother were designated as a sibling group and placed together in the same foster home, and development of that relationship in Los Angeles was a factor that weighed against an Idaho placement.

Because substantial evidence supported the juvenile court's finding that it would have been detrimental to A.L.'s emotional well-being to place her in Idaho with Father, we affirm.[1] Mother is not a party to this appeal.

## A. The May 2012 Welfare and Institutions Code section 300 petition[2]

Mother is the mother of A.L., born in 2009, and Andrew L., born in 2011. Father is A.L.'s father. Alejandro A. is Andrew's father.

---

[1] We deny DCFS's motion for judicial notice of the juvenile court's September 27, 2013 minute order of a hearing that occurred after the dispositional hearing that is the subject of this appeal. (*In re Zeth S.* (2003) 31 Cal.4th 396, 413.)

[2] Undesignated statutory references are to the Welfare and Institutions Code.

On April 5, 2012, the Los Angeles County Department of Children and Family Services (DCFS) received a referral from Alejandro that Mother and maternal grandmother were using methamphetamine, Mother was mentally ill, and the home was dirty. On a subsequent recommendation of DCFS, Mother began participating in individual counseling and a domestic violence support group.

On April 21, 2012, DCFS received a referral based on domestic violence between Mother and Alejandro. As the result of a team decision making meeting (TDM) the minors were detained from the care of Alejandro and left in Mother's custody.

On May 22, 2012, DCFS filed a petition pursuant to section 300, subdivisions (a) (serious physical harm) and (b)(failure to protect) on behalf of the minors, alleging they were at risk due to the domestic violence between Mother and Alejandro and Alejandro's current abuse of methamphetamine and alcohol.

The juvenile court ordered A.L. to be released to Mother and Father's custody; detained Andrew from Alejandro's custody; and released Andrew to Mother's custody.

## B. Subsequent reports

In its June 22, 2012, jurisdiction/disposition report, DCFS reported that Mother told DCFS that she and Father had been long-time friends, but had not been in a romantic relationship except for "'hooking up.'" When A.L. was six months old, Mother informed Father of A.L.'s birth. Thereafter, Father became involved in A.L.'s life.

Father confirmed Mother's statement regarding their relationship. He had been involved with gangs and drugs from an early age and had been incarcerated, but had turned his life around and moved from California to Idaho in June 2012. His oldest child by another woman was 18 years old and he had full custody of his two other children by another woman who had not reunified with the children after they had been removed from her care through dependency proceedings.

On June 22, 2012, the juvenile court dismissed without prejudice the section 300 petition filed on behalf of A.L. The court took certain actions as to Andrew that are not relevant here.

3

On January 23, 2013, the minors were detained from Mother's custody and placed together in a foster home because Mother had allowed Alejandro to see the minors in violation of court orders.

Subsequently, Father told DCFS that he was gainfully employed, if A.L. failed to reunify with Mother he wanted her released to him in Idaho, and he was willing to raise Andrew as his own child if it meant that A.L. no longer had to be in foster care.

## C. The January 2013 section 300 petition

On January 28, 2013, DCFS filed a section 300 petition pursuant to subdivisions (b) and (j) (abuse of sibling) on behalf of A.L. and a section 387 petition, which supplemented the section 300 petition previously sustained on behalf of Andrew, alleging that Mother and Alejandro had a history of domestic violence and Mother had allowed Alejandro unlimited access to Andrew in violation of the juvenile court's orders.

At the January 28, 2013 detention hearing, the juvenile court ordered the minors detained and ordered monitored visits for Father.

## D. Reports and subsequent events

DCFS reported in its February 21, 2013 jurisdiction/disposition report that allegations against Father had been dismissed in a previous dependency case regarding Father's child born in 2010. Eventually, the juvenile court had terminated jurisdiction over the matter with an order granting Father sole physical and legal custody of that child. Another petition, in which Father had not been named as an offending parent, had been filed with respect to Father's child born in 2012. Ultimately, the court had terminated jurisdiction over that matter with a family law order granting Father sole physical and legal custody of that child.

Father told DCFS that A.L. had a strong parental bond with him and that she was bonded to his other children, her half-brothers. Father claimed that maternal grandmother did not like him and would not let him see A.L. Father reported that he had not been aware of domestic violence issues between Mother and Alejandro until A.L. had been detained. He said that after proceedings had been initiated, Mother had told him that she had stopped seeing Alejandro, she was doing well in her court-ordered programs, and

4

Alejandro was in full compliance with the juvenile court's orders in that he had enrolled in classes and counseling and was no longer on parole.  Father stated he had told Alejandro to come to Idaho for work, but "only meant it if [Alejandro] gets his life together."

Maternal grandmother told DCFS that she did not believe Father had a parental relationship with A.L.

Mother told DCFS that Father had very limited involvement with A.L. because his ex-wife, Mandy N., did not want Father to care for A.L., A.L. did not recognize Father as her father, A.L. addressed Father as "'Abel'" and Alejandro as "'dad,'" there was no parental bond between A.L. and Father, and Father had never paid child support.

DCFS reported that A.L. and Andrew were healthy but because they appeared to have speech delays, requested that the juvenile court refer them to the Regional Center, which provides services for developmentally disabled clients.  DCFS also reported that Father had stable housing, had support from paternal grandmother, Father had been in frequent contact with DCFS, and had called the foster parents to inquire about the well-being of A.L., but had not visited A.L.  DCFS recommended that because Father had not seen A.L. since December 2011, or January 2012, had only sporadic telephone contact with her prior to her detention, and A.L. referred to him by his first name "[i]t does not appear in the best interest of the child to terminate jurisdiction with a Family Law Order at this time as moving to Idaho would not only demand [A.L.] adjust to a new state, a new home and a parent with whom she is not well-bonded, but also limit her ability to visit with her mother, the parent with whom she has a demonstrable bond."

On February 21, 2013, the juvenile court sustained the allegations in the section 300 petition with respect to A.L.

On March 20, 2013, DCFS reported that Mother denied that anyone in her family made it difficult for Father to visit A.L.  DCFS did not recommend release of A.L. to Father "[d]ue to the absence of in-person visitation and sporadic nature of telephone contacts prior to the detention of the children and while the child has been in placement."  Further, DCFS had "not observed any contact between [Father and A.L.], and the nature

5

of the relationship cannot be assessed.  Due to the young age of the child and concerns regarding her speech, it is difficult to assess the child's bond with the father through verbal interviews."

On March 20, 2013, Father submitted a letter to the court, stating he had a strong relationship with A.L. and that he had not visited A.L. because he currently lived in Idaho and could not miss work.  He stated that he had always taken A.L. with him to court dates in the dependency matters concerning his other children, of whom he now had full custody.  He said it would be in A.L.'s best interest for A.L. to be with him rather than with a foster family.  He stated he was living with his two sons and his mother and could provide A.L. a safe and loving home.

**E.  The disposition hearing**

At the March 20, 2013, disposition hearing, the juvenile court designated A.L. and Andrew a sibling group.

Father's counsel urged that A.L. be placed with Father in Idaho.  Counsel stated that Father had been employed in Idaho since December 17, 2012; paternal grandmother provided child care for Father's other children while he was at work; and Father had moved to Idaho in search of a better life for himself and his children.

Paternal grandmother informed the juvenile court that since September 2012, Father had been living with her in Idaho in a single family residence.  She stated that if A.L. lived with Father, A.L. would have her own bedroom, bed, bedding, drawers, furniture, and clothing.

Mother's counsel requested that A.L. stay in California because there was no parental bond between Father and A.L. and that moving A.L. to Idaho would prevent A.L. from visiting Mother and other maternal relatives to whom A.L. was bonded.  Mother's counsel denied that Mother and her family had impeded Father's relationship with A.L.

DCFS expressed concern that Father did not have a parental bond with A.L. and that Father had not visited A.L. since the dependency matter began in May 2012.

A.L.'s counsel urged that A.L. remain placed out of the homes of Mother and Father. Counsel argued that Father had not developed a relationship with A.L., A.L. referred to Father as "'Abel,'" and Father had not visited A.L. for over a year even though he had lived out of state for only six months. Counsel urged that, as evidenced by Father's Facebook post inviting Alejandro to move to Idaho, Father had known that Mother and Alejandro had resumed their relationship, even though he was aware of the juvenile court's order that Mother and Alejandro were not supposed to be in contact with each other. She also argued that A.L. "has had a hard time adjusting to foster care and being separated from her mother. That's why I'm requesting the play therapy that I wrote on the dispo plan, as well as a speech therapy assessment." She argued that speech and play therapy services might not be available out-of-state; moving A.L. out-of-state would hinder the ability of Mother, A.L.'s primary caregiver for her entire life, to reunify with A.L.; and A.L. and Andrew had been designated a sibling group. A.L.'s counsel requested that the juvenile court order an interstate compact on the placement of children (ICPC), which is a contract among states authorizing them to work together to ensure that minors receive adequate protection and support services.

The juvenile court stated that it did not doubt Father's interest in A.L. and that "were he living in LA County, where we could get these services—play therapy, speech therapy assessment, etc.—that has been requested by minor's counsel for the child, it would be a different situation. I would be going along with you. I have no idea what they can do in Idaho. I really don't." The court considered ordering an ICPC and a court appointed special advocate (CASA) to determine whether services for A.L. would be available in Idaho and for A.L. to have a 29-day visit with Father. The court also noted that Father was nonoffending and had a constitutional right to raise A.L. It observed that Father asserted that Mother and her family impeded his relationship with A.L, while Mother claimed that Father did not have a parental bond with A.L. It stated that Mother's argument that Father did not have a strong relationship with A.L. rang hollow, "considering the fact that we dropped her into a foster family who she and her brother didn't even know."

7

The juvenile court concluded that it was not in A.L.'s best interests to place her with Father, because it would be detrimental to A.L.'s "emotional well-being" if she did not receive recommended therapies the court deemed important. The court requested that the parties provide information to the court "today" regarding family members with whom A.L. and Andrew could live.

The juvenile court declared the minors dependents of the court, designated them a sibling group, and ordered them suitably placed; ordered DCFS to consider a 29-day visit between A.L. and Father over the next 90 days; requested appointment of a CASA for A.L.; ordered DCFS to provide a report addressing services available in Idaho for A.L.; ordered DCFS to evaluate maternal aunt as a placement resource; and granted Father unmonitored visits when in California and telephonic contact with A.L.

Father appealed.

## DISCUSSION

**Substantial evidence supported the juvenile court's finding that placement of A.L. with Father in Idaho would be detrimental to her emotional well-being**

We review the juvenile court's finding of detriment under the substantial evidence standard. "A detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm. [Citation.]" (*In re Luke M*. (2003) 107 Cal.App.4th 1412, 1425.) "The clear and convincing standard was adopted to guide the trial court; it is not a standard for appellate review. [Citation.] The substantial evidence rule applies no matter what the standard of proof at trial. 'Thus, on appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong." [Citation.]' [Citation.]" (*In re E.B.* (2010) 184 Cal.App.4th 568, 578.) "'In making this determination, all conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.] In dependency proceedings, a trial court's determination will not be disturbed unless it exceeds the bounds of reason. [Citation.]' [Citation.]" (*Id*. at p. 575.)

8

"Section 361.2, subdivision (a) governs placement of a child after the dependency court has acquired jurisdiction of a child." (*In re Luke M.*, *supra*, 107 Cal.App.4th at p. 1420.) Section 361.2 states, "(a) When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." Section 361.2, subdivision (c) requires the court to make a finding "either in writing or on the record of the basis for its determination under subdivision[] (a)."

In *In re C.C.* (2009) 172 Cal.App.4th 1481, 1490, the court observed, "In an appropriate case, all that might be required is a finding such a placement would impair the emotional security of the child." (*Ibid.*)

The reason articulated by the juvenile court for declining to place A.L. with Father in Idaho was that the court had no information as to the availability in Idaho of certain therapies that had been recommended for A.L. The court concluded that an Idaho placement would be detrimental to A.L.'s "emotional well-being" if the services required were not available in Idaho.

Despite the juvenile court's failure to discuss other reasons in detail, the record contains substantial additional evidence that supports the court's determination that A.L. should not be placed in Idaho. A.L. had a parental bond with Mother, Mother had been her primary caregiver for her entire life, and A.L. was reported to have "had a hard time" due to being separated from Mother. Placing her in Idaho could have further exacerbated that problem. In addition, moving A.L. to Idaho would likely have prevented Mother from visiting and might have hampered A.L.'s reunification with Mother. If reunification efforts with Mother should fail, placement with Father can be reconsidered. There also appears to have been a possibility that A.L. could be placed with a relative if she remained in Los Angeles.

Although the juvenile court did not specifically refer to the sibling bond between A.L. and Andrew in its detriment finding, it had designated A.L. and Andrew a sibling group at the same hearing. "Sibling relationships are clearly a relevant consideration in evaluating a child's emotional well-being. Thus, under the statutory scheme governing postremoval placement decisions, a detriment finding can properly be supported by the emotional harm arising from the loss of sibling relationships even in the absence of the noncustodial parent's contribution to the detriment." (*In re Luke M.*, *supra*, 107 Cal.App.4th at p. 1425.) Accordingly, we conclude that the designation of A.L. and Andrew as a sibling group also supported the detriment finding.

Father observes that "it is undisputed that the court's finding of detriment to A.L. if she were placed with Father in Idaho was based on the court's uncertainty as to whether or not services for A.L., namely, speech therapy, could be provided to her in [Idaho]." He argues that even if such services were not available in Idaho through its social service agencies, "DCFS could ensure she was provided the services with the cooperation and assistance of Father and the paternal grandmother." But Father provides no explanation of how these services would have been provided or who would have paid for them. Although Father complains that DCFS should have arranged for services for A.L. in Idaho between the time she was detained in January 2013 and the disposition hearing in March 2013, he does not establish that DCFS had the authority to do so without an order of the court.

Father cites *In re John M.* (2006) 141 Cal.App.4th 1564, where the appellate court held that the juvenile court's finding of detriment based on a 13-and-a-half year old minor's wishes, sibling bond, need for services, lack of relationship with the noncustodial father, and need for counseling and attention deficit hyperactivity disorder medication was not supported by substantial evidence. (*Id*. at pp. 1570–1571.) However, *In re John M.* is inapposite. There the appellate court determined that the detriment finding was not supported by substantial evidence in part because there was no evidence that the father could not meet his son's special needs. (*Ibid*.) In addition, the father, who had been out

10

of contact, had resumed contact with the child a year before the dependency petition was filed. (*Ibid.*)

In light of the substantial evidence available to the juvenile court, we cannot say that the court's finding of detriment exceeded the bounds of reason. (*In re E.B.*, *supra*, 184 Cal.App.4th at p. 575.)

We conclude that substantial evidence supported the juvenile court's finding that placement of A.L. with Father in Idaho would have been detrimental to her emotional well-being.

## DISPOSITION

The juvenile court's March 20, 2013 dispositional orders are affirmed.

NOT TO BE PUBLISHED.

MILLER, J.[*]

We concur:

ROTHSCHILD, Acting P. J.

CHANEY, J.

---

[*] Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.